UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION

| | |
|---|---|
| Lori Gilker, individually and on behalf of all others similarly situated,<br><br>                      Plaintiff,<br><br>    - against -<br><br>Chobani, LLC,<br><br>                      Defendant | 3:21-cv-00488-DWD<br><br><br>First Amended Class Action Complaint<br><br>Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

    1.    Chobani, LLC ("defendant") manufactures, labels, markets, and sells yogurt under the Chobani Complete brand in flavors including vanilla and strawberry ("Product").



2. The front label contains numerous statements ("claims") relating to the nutritional, compositional, sensory, organoleptic, and allergenic attributes of the Product.

3. The nutrition claims include "Chobani Complete" and "Advanced Nutrition Yogurt."

4. The nutrient claims[1] include:

- 0g Added Sugar*
  *Not a low calorie food
- 3g Soluble Fiber
- 17g Complete Protein
- 20 Amino Acids
- + Prebiotic [and] Probiotic

5. The ingredient claims include:

- Only Natural Ingredients
- pictures of the characterizing flavor ingredient, i.e., vanilla beans and flowers or strawberries
- + Only Real Vanilla (or Only Real Fruit)
- Vanilla (or other characterizing flavor ingredient)

6. The "allergen" claims include "Lactose-Free" and "Easy to Digest."

7. The back of the package lists the ingredients.

**Ingredients:** Cultured lowfat milk, water, chicory root fiber, less than 1.5% of: vanilla extract, lactase*, natural flavors, monk fruit extract, stevia leaf extract (reb m), fruit pectin, locust bean gum, lemon juice concentrate.

**6 live and active cultures:**

S. Thermophilus, L. Bulgaricus, L. Acidophilus, Bifidus, L. Casei, and L. Rhamnosus.

*Ingredient not found in regular yogurt.

---

[1] The term "nutrient claims" is not used synonymously with "nutrient content claims." Nutrient claims refer to statements

8. The back panel contains the Nutrition Facts.



### I. CLAIMS ARE MISLEADING AND CONTRARY TO FEDERAL AND STATE REGULATIONS

9. The representations are misleading because the Product's claims are false, deceptive, and misleading to consumers.

10. Federal and identical state regulations contain requirements for what a company says on a food label. *See* 21 U.S.C. § 343(a)(1) (a food is misbranded when it contains a statement that is "false or misleading"); Illinois Food, Drug and Cosmetic Act ("IFDCA"), 410 ILCS 620/1 et seq.; 410 ILCS 620/21(j) ("federal [food labeling] regulation[s] [are] automatically adopted").

11. The Illinois Consumer Fraud and Deceptive Business Practices Act provides protection for consumers purchasing items like the Product, and states:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . are hereby declared unlawful

815 ILCS 505/2.

A. <u>Nourishment Claim</u>

12. The Product's name, "Chobani Complete – Advanced Nutrition Yogurt," tells consumers it is sufficient to provide complete nutrition.

13. Reasonable consumers link the word "Complete" to "Nutrition" because any other interpretation makes little sense.

14. This is confirmed by Defendant's marketing, which describes the Product with the statements, "Nutrition puzzle, solved. Introducing Chobani Complete – advanced lactose-free yogurt with up to 25g of complete protein*, 3g fiber, and 0g added sugar**."



15. The dictionary definition of "complete" is "having all the necessary or appropriate parts."

16. The implication suggests and implies that (1) consumption of only the Product will provide enough nutrition to constitute a sufficient and full source of nutrition and (2) consumption of the Product maintains health, makes an individual well-fed and is a unique, special, and exclusive source of nutrition and health benefits.

4

17. However, the Product does not provide all of the nutrients necessary for a sound, complete and balanced diet nor have competent and reliable scientific tests demonstrated that the Product is a total diet replacement.

18. The FDA has established a Reference Daily Intake ("RDI") for "vitamins and minerals which are essential in human nutrition," which include:

| Biotin | Iodine | Phosphorus | Vitamin B12 |
|---|---|---|---|
| Calcium | Iron | Potassium | Vitamin B6 |
| Chloride | Magnesium | Protein | Vitamin C |
| Choline | Manganese | Riboflavin | Vitamin D |
| Chromium | Molybdenum | Selenium | Vitamin E |
| Copper | Niacin | Thiamin | Vitamin K |
| Folate | Pantothenic acid | Vitamin A | Zinc |

21 C.F.R. § 101.9(c)(8)(iv).

19. Federal regulations require the label's declaration of vitamins and minerals to include vitamin D, calcium, iron, and potassium. 21 C.F.R. § 101.9(c)(8)(ii).

20. The Product supplies zero percent of the RDI for iron and vitamin D.

21. The Product's calcium content is 10% or 160 mg, based on an RDI of 1,300 mg.

22. The Product's potassium content is 4% or 220 mg, based on an RDI of 4,700 mg.

23. The other vitamins and minerals identified in 21 C.F.R. § 101.9(c)(8)(iv) are only required to be declared when "a claim is made about them" or if the "component is otherwise referred to on the label." 21 C.F.R. § 101.9(c)(8)(ii).

24. The Product's label, stating, "Chobani Complete – Advanced Nutrition Yogurt," and its interpretation by consumers that it provides "Complete Nutrition," means the Product is required to declare all of the vitamins and minerals identified by the FDA as being essential to human health.

B. <u>Nutrient Content Claims</u>

25. Congress required that the FDA develop and implement nutrient content claims to prevent consumers from being misled by the endless terms and descriptors appearing on foods.

26. Nutrient content claims tell consumers about the level of relevant nutrients in a food.

27. Nutrient content claims are restricted to nutrients that have an established Reference Daily Intake ("RDI") or Daily Reference Value ("DRV").

28. If this were not the case, companies would be able to promote nutrients and ingredients which were of limited or no value, and consumers would not be able to know if those statements were truthful and meaningful.

29. The criteria for nutrient content claims were the result of dozens of meetings held by the FDA with consumers.

30. "Expressed" nutrient content claims are direct statements about the level (or range) of nutrients in a food, e.g., "low sodium" or "contains 100 calories." 21 C.F.R. § 101.13(b)(1).

31. "Implied" nutrient content claims can describe the food or an ingredient in a manner that suggests that a nutrient is absent or present in a certain amount. 21 C.F.R. § 101.13(b)(2).

32. For example, a claim that a food is "high in oat bran" is understood as a way of saying that food is high in fiber. 21 C.F.R. § 101.13(b)(2)(i).

33. Implied nutrient content claims can also suggest that a food, because of its nutrient content, may be useful in maintaining healthy dietary practices and is made in association with an explicit claim or statement about a nutrient e.g., "healthy, contains 3 grams (g) of fat." 21 C.F.R. § 101.13(b)(2)(ii).

1. <u>Probiotic and Prebiotic Claims</u>

34. The FDA has not defined probiotics but cites their definition by the Food and

6

Agriculture Organization ("FAO") and the World Health Organization ("WHO") as "live microorganisms which when administered in adequate amounts confer a health benefit on the host."

35. The definition of prebiotics is similar: "a nondigestible food ingredient that beneficially affects the host by selectively stimulating the growth and/or activity of one or a limited number of bacteria in the colon, and thus improves host health."

36. Consumer demand for probiotics and prebiotics is based on the messages conveyed by companies which sell them.

37. Most studies on probiotic strains – including those identified in the Product – S. Thermophilus, L. Bulgaricus, L. Acidophilus, Bifidus, L. Casei, and L. Rhamnosus – reveal no benefit to persons who are already healthy.

38. The only people who *may* benefit from probiotics are those who suffer from a small number of intestinal disorders.

39. Experts warn that healthy people who consume probiotics may even be harmed.

40. According to Dr. Matthew Ciorba, a gastroenterologist at Washington University in St. Louis, "There is no evidence to suggest that people with normal gastrointestinal tracts can benefit from taking probiotics."

41. The theory behind probiotics and prebiotics is based on the live bacteria surviving and propagating in the intestinal tract and altering the internal composition of the human body.

42. Defendant touts the probiotics and prebiotics through the + or plus symbol.[2]

---

[2] Probiotics and prebiotics will be used interchangeably from this point forward in the pleading.



43. The top of the Product states, "Billions of Probiotics."

44. However, billions of probiotics are "still just a drop in a bucket," because "[T]he gut always has orders of magnitude more microbes," with tens of trillions of bacteria, states Shira Doron, an infectious disease expert at Tufts Medical Center.

45. The plus symbol, in conjunction with "probiotic" and "prebiotic," tells consumers the Product has "more" of these components than comparable foods. 21 C.F.R. § 101.54(e) (identifying "plus" as a synonym for "more").

46. Nutrient content claims for the term "more" and its synonyms are restricted to describing the level of protein, vitamins, minerals, dietary fiber, or potassium. 21 C.F.R. § 101.54(e)(1).

47. While the front label also uses the plus symbol in conjunction with "ONLY REAL VANILLA," consumers are smart enough to distinguish the context of the plus symbol.

48. In the context of the purported "ONLY REAL VANILLA," the plus symbol is equivalent to a bullet point or checkmark, ticking off attributes of added value.

49. In the context of scientific-sounding terms – Probiotic and Prebiotic – consumers will associate a "plus" symbol to mean not just that the Product contains probiotics and prebiotics,

8

but that (1) probiotics and prebiotics are recognized by relevant authoritative bodies as nutrients of dietary significance and (2) the Product had more of them than other comparable products.

50. The probiotic and prebiotic claims are deceptive and misleading because probiotics and prebiotics are not recognized as having an RDI or DRV and are not permitted to be the subject of nutrient content claims.

51. Further, the plus symbol, which tells consumers it contains *more* of these components, is also misleading, because the label offers no comparison to other foods with probiotics and prebiotics, i.e., "More, compared to what?"

52. The probiotics and prebiotics representations are an unlawful nutrient content claim, which is also misleading because there is no recognized or accepted number, amount or colony forming units ("CFU") of probiotics and prebiotics with which the quantities in the Product can be compared.

2. Amino Acid Claims

53. The front label states, "20 Amino Acids."

54. Amino acids are what make up protein.

55. About 500 amino acids have been found in nature, but 20 amino acids make up the proteins found in humans.

56. Out of the 20 amino acids, nine are essential amino acids.

57. Amino acids are a food additive.

58. Naturally occurring constituents of an ingredient, such as amino acids, are not considered ingredients and the Nutrition Facts and ingredient list do not indicate any added amino acids.

59. The FDA has issued warning letters to companies which have made amino acid

9

claims, "because there is no established Reference Daily Intake (RDI) or Daily Reference Value (DRV) for amino acids."[3]

60. Consumers seeing the Product's labeling of "20 Amino Acids" will not know that this is referring to the amino acids presumably in the Product's ingredients, but will expect it contains added amino acids, though the Product admittedly does not have added amino acids.

61. The Product does not have all the necessary and appropriate parts related to an average consumer's nutritional needs. The "Advanced Nutrition [Yogurt]" representation is false, deceptive, and misleading because the ingredients and composition are not beyond what others have already introduced into the marketplace.

62.

C. Ingredient Claims

63.

   1. Only Natural Ingredients

64. The FDA has considered the term "natural" to mean that nothing artificial or synthetic has been included in, or has been added to, a food that would not normally be expected.

65. Consumers increasingly are avoiding foods that are synthetic, due to negative health and environmental effects caused by chemicals and additives used.

66. Consumers pay more for products that claim to be made with natural ingredients.

67. The representation that the Product contains "Only Natural Ingredients" is false,

---

[3] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/professional-botanicals-inc-517911-07062017

deceptive and misleading due to the use of "monk fruit extract."

68. *Siraitia grosvenorii* Swingle ("Monk") fruit extract (SGFE) is a high-intensity, non-nutritive sweetener.

69. Should consumers read "monk fruit extract" on the ingredient list, they will think it is made similarly to "vanilla extract," which only involves ethyl alcohol to remove the flavoring principles.

70. However, the sweetener used by defendant is not a simple extract from the Luo Han Guo or monk fruit.

71. Real monk fruit extract is very sweet, but its aftertaste causes producers to further refine and process it to modify its taste.

72. This is typically done with solvents and additives, such as divinylbenzene copolymer, calcium hydroxide, hydrochloric acid and styrene divinylbenzene ion exchange resin.

73. The solvents and additives used in making the monk fruit extract are not natural, as those terms are understood by consumers.

74. Even if none of these solvents or additives remain in final product, their use in an ingredient identified as "monk fruit extract" is misleading.

75. Consumers expect that a representation that a product is made with "Only Natural Ingredients" does not only mean the ingredients are natural, but that they were obtained in a natural way – without harsh processing and additives.

   2. Only Real Vanilla and Only Real Fruit

76. The front label of the Products state "Only Real Vanilla" and "Only Real Fruit" for the non-vanilla varieties.

77. This is misleading because it gives the impression to consumers the Product's flavor

11

is only from "real vanilla" or "real fruit."

78. The Products contain "natural flavors," listed on the ingredient list.

79. This ingredient is flavoring that simulates vanilla and the "real fruit" ingredients, like strawberries.

80. The "natural flavor" causes consumers to experience a greater vanilla and strawberry taste.

81. By saying "only real…," consumers expect the Product contains more of the named ingredient or fruit than it does.

## II. CONCLUSION

82. Reasonable consumers must and do rely on a company to honestly identify and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

83. The value of the Product that plaintiff purchased was materially less than its value as represented by defendant.

84. Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

85. Had Plaintiff and proposed class members known the truth, they would not have bought the Product or would have paid less for it.

86. As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than no less than $4.99 for 24 OZ (680g), excluding tax, higher than similar products represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

### Jurisdiction and Venue

87. Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

88. The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

89. Plaintiff Lori Gilker is a citizen of Illinois.

90. Defendant Chobani, LLC is a Delaware limited liability company with a principal place of business in Norwich, Chenango County, New York and upon information and belief, at least one member of defendant is not a citizen of the same state as the plaintiff.

91. Plaintiff and defendant's managing member are citizens of different states.

92. Defendant transacts business within this district, through the marketing, supply, and sales of its products at thousands of stores within this district and sold online to citizens of this district.

93. Venue is in this district because plaintiff resides in this district and the actions giving rise to the claims occurred within this district.

94. Venue is in the East St. Louis Division of this District because a substantial part of the events or omissions giving rise to the claim occurred in Madison County, i.e., Plaintiff's purchase of the Product and her awareness of the issues described here.

### Parties

95. Plaintiff Lori Gilker is a citizen of Collinsville, Madison County, Illinois.

96. Defendant Chobani, LLC, is a Delaware limited liability company with a principal place of business in Norwich, New York, Chenango County.

97. Defendant is one of the largest yogurt producers in the world and controls over fifty percent of the United States yogurt market.

98. Defendant popularized the Greek yogurt category in the United States.

99. Greek yogurt is a thick yogurt with higher protein content than regular yogurt.

100. Defendant is considered an "innovator" when it comes to pushing the boundaries in consumer foods and beverages.

101. Defendant's annual sales are approximately $1.5 billion.

102. These facts show a company with a significant amount of goodwill and equity when it comes to consumer purchasing.

103. The Product is available from almost everywhere food is sold, from convenience stores at gas stations, grocery stores, specialty markets, warehouse clubs, and sold online.

104. Plaintiff purchased the Product on at least one occasion within the statutes of limitations for each cause of action, including in April 2021, at locations including Walmart, 1101 Beltline Rd, Collinsville, IL 62234.

105. Plaintiff bought the Product because she expected the + (plus) symbol in conjunction with "Probiotic" and "Prebiotic" meant that these were nutrients of dietary significance, and that it contained more of them than other comparable foods.

106. Plaintiff bought the Product because she expected "Only Natural Ingredients" meant the ingredients were made through natural processes without non-natural additives and processing aids.

107. Plaintiff did not know that probiotics and prebiotics are ingredients with no established dietarily significant values, and that no credible evidence existed of their efficacy or usefulness to healthy people.

108. Plaintiff did not know how monk fruit extract was made.

109. Plaintiff was unaware of the other misrepresentations on the Product.

110. Plaintiff relied on the words and images on the labels, identified here.

111. Plaintiff bought the Product at or exceeding the above-referenced price.

112. Plaintiff would not have purchased the Product if she knew the representations were false and misleading or would have paid less for it.

113. Plaintiff chose between Defendant's Product and other similar products which were represented similarly, but which did not misrepresent their attributes and/or lower-priced products which did not make the statements and claims made by Defendant.

114. The Product was worth less than what Plaintiff paid and she would not have paid as much absent Defendant's false and misleading statements and omissions.

115. Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance that Product's representations are consistent with its composition.

116. Plaintiff is unable to rely on the labeling of this, and other Chobani products, which means she buys fewer Chobani items than before being aware of this issue, which causes her to spend more money on buying other brands.

117. Plaintiff wants to resume purchasing Chobani products in the same amount as she previously did.

<u>Class Allegations</u>

118. Plaintiff seeks certification under Fed. R. Civ. P. 23(b)(2) and (b)(3) of the following

classes:

> **Illinois Class:** All persons in the State of Illinois who purchased the Product during the statutes of limitations for each cause of action alleged.
>
> **Consumer Fraud Multi-State Class:** All persons in the States of North Dakota, Kansas, West Virginia, Wyoming, and Delaware, who purchased the Product during the statutes of limitations for each cause of action alleged

119. Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

120. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

121. Plaintiff is an adequate representative because her interests do not conflict with other members.

122. No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

123. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

124. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

125. Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>Illinois Consumer Fraud and Deceptive Business Practices Act
("ICFA"), 815 ILCS 505/1, et seq.</u>

<u>(Consumer Protection Statute)</u>

126. Plaintiff incorporates by reference all preceding paragraphs.

127. Plaintiff and class members desired to purchase a product that had the qualities described on the label.

128. Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

129. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

130. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

131. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

132. Plaintiff relied on the representations and omissions.

133. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Violation of State Consumer Fraud Acts</u>

<u>(On Behalf of the Consumer Fraud Multi-State Class)</u>

134. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

135. Defendant intended that plaintiff and each of the other members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

136. As a result of defendant's use or employment of artifice, unfair or deceptive acts or business practices, plaintiff, and each of the other members of the Consumer Fraud Multi-State Class, have sustained damages in an amount to be proven at trial.

137. In addition, defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

Breaches of Express Warranty,
Implied Warranty of Merchantability and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.

138. The Product was manufactured, identified, and sold by defendant and expressly and impliedly warranted to plaintiff and class members the attributes here.

139. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

140. This duty is based on Defendant's outsized role in the market as a trusted brand, as described above, which means consumers expect it to be different than other companies without such a respected brand.

141. Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers, and their employees.

142. Defendant received notice and should have been aware of these issues due to complaints by regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

143. The Product did not conform to its affirmations of fact and promises due to defendant's actions and was not merchantable because it was not fit to pass in the trade as advertised.

144. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

145. Defendant had a duty to truthfully represent the Product, which it breached.

146. This duty is based on defendant's position, holding itself out as having special knowledge and experience in this area, as a leading manufacturer of yogurt.

147. The representations took advantage of consumers' cognitive shortcuts made at the

point-of-sale and their trust in defendant.

148.  Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

149.  Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Fraud

150.  Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it was consistent with its label.

151.  Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provide it with actual and/or constructive knowledge of the falsity of the representations.

152.  Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

### Unjust Enrichment

153.  Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

### Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

   **WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying plaintiff as representative and the undersigned as counsel for the class;
2. Entering preliminary and permanent injunctive relief by directing defendant to correct the

19

challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   October 23, 2021

                                             Respectfully submitted,

                                             Sheehan & Associates, P.C.
                                             /s/Spencer Sheehan
                                             60 Cuttermill Rd Ste 409
                                             Great Neck NY 11021
                                             Tel: (516) 268-7080
                                             spencer@spencersheehan.com